1   Scott Edward Cole, Esq. (S.B. #160744)
    Cesar A. Alvarado (S.B. # 193973)
2   **SCOTT COLE & ASSOCIATES, APC**
    1970 Broadway, Ninth Floor
3   Oakland, California 94612
    Telephone:  (510) 891-9800
4   Facsimile:   (510) 891-7030
    Email: scole@scalaw.com
5   Email: calvarado @scalaw.com
    Web:   www.scalaw.com
6
    Kelley Gelini, Esq. (S.B. #160698)
7   Wesley Wakeford, Esq. (S.B. #224801)
    **WAKEFORD GELINI**
8   275 Battery, Suite 1300
    San Francisco, California 94111
9   Telephone:  (415) 578-3510
    Facsimile:  (415) 294-2890
10  Email: wes@wakefordlaw.com
    Email: kelley@wakefordlaw.com
11  Web:   www.wakefordlaw.com

12  Attorneys for Representative Plaintiffs
    and the Plaintiff Class(es)
13

14              **UNITED STATES DISTRICT COURT**

15            **NORTHERN DISTRICT OF CALIFORNIA**

16                   **SAN JOSE DIVISION**

17

18  ARENA RESTAURANT AND          )   **Case No. 5:17-CV-03805-LHK**
    LOUNGE LLC, et al.,           )
19                                )
                  Plaintiffs,     )   <u>**CLASS**</u> **ACTION**
20                                )
    vs.                           )   **THIRD AMENDED COMPLAINT FOR**
21                                )   **DAMAGES, RESTITUTION, AND**
    SOUTHERN GLAZER'S WINE AND    )   **INJUNCTIVE/EQUITABLE RELIEF**
22  SPIRITS, LLC, et al.,         )
                                  )
23                Defendants.     )
                                  )   ***JURY TRIAL DEMANDED***
24  _____)

25

26

27

28

*SCOTT COLE & ASSOCIATES, APC*
*ATTORNEYS AT LAW*
*THE TOWER BUILDING*
*1970 BROADWAY, NINTH FLOOR*
*OAKLAND, CA 94612*
*TEL. (510) 891-9800*

Representative Plaintiffs allege as follows:

### INTRODUCTION

1.     This is a class action brought by Representative Plaintiffs on behalf of themselves as well as on behalf of California and national classes of all entities/persons who maintained an open account with Defendants and/or any of them (hereinafter "Southern Glazer," "Defendant," and/or "Defendants") at any time during, at least, the last four years (the "limitations period").

2.     Representative Plaintiffs, on behalf of themselves and members of the respective classes (hereinafter "class members" in one or more of the classes identified herein), seek damages, interest thereon, restitution, injunctive and other equitable relief, reasonable attorneys' fees and costs and disgorgement of all benefits Southern Glazer enjoyed from its numerous unlawful and/or deceptive business practices, as detailed herein.

3.     Representative Plaintiffs assert that Southern Glazer knowingly engaged in unfair, unlawful, deceptive, and fraudulent business practices vis-à-vis a common sales and distribution scheme that runs afoul of a multitude of California state and federal unfair competition laws and fraud protection statutes. Although more fully set forth below, this unlawful scheme entailed using class members' account numbers to make unauthorized purchases for third-parties without class members' knowledge or consent, creating tax liabilities for class members and/or otherwise threatening class members' liquor licenses and business operations.

4.     Representative Plaintiffs assert that, during the limitations period, Southern Glazer had, and continues to have, a consistent policy of permitting, encouraging and/or allowing its officers, managers, agents and/or other employees to purchase alcohol on the accounts/licenses of class members, without their knowledge or consent, and/or to provide their account/license numbers to third-parties, who then purchase alcohol by assuming class members' business identities, without class members' knowledge or consent.

5.     Representative Plaintiffs allege that Southern Glazer offered, and continues to offer, secret rebates, gifts and samples, engage in collusive, inequitable pricing and sales tactics,

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

1   and otherwise use practices, threats, and intimidation to effectuate activities in violation of state

2   and federal alcohol regulations and unfair competition statutes.

3   6.   Southern Glazer's unlawful scheme also includes (1) permitting its own officers,

4   managers, agents and/or other employees to purchase liquor on class members' accounts, using

5   cash, and then storing the liquor in order to meet sales quotas, (2) engendering unfair competition

6   through "tying" practices, (3) permitting its officers, managers, agents and/or other employees to

7   purchase liquor on class members' accounts, who then temporarily store the liquor, returning it

8   later, in order to meet quotas, but without refunding the money, (4) falsifying sales documentation

9   to avoid scrutiny for Southern Glazer's unlawful schemes, and (5) ignoring complaints from and/or

10   unlawfully pressuring retailers with regard to the unfair and unlawful business practices detailed

11   in this pleading, including threatening to cut off supply to customers/retailers. These practices are

12   widespread and unlawful.

13   7.   Southern Glazer's unlawful scheme aims to enhance profits and maintain its near-

14   monopoly position in the liquor distribution industry.

15

16   **JURISDICTION AND VENUE**

17   8.   Jurisdiction is proper in this Court under 28 U.S.C. §1332 (diversity jurisdiction)

18   and/or 28 U.S.C. §1331 (controversy arising under United States law). Supplemental jurisdiction

19   to adjudicate issues pertaining to California state law is proper in this Court under 28 U.S.C. §1367.

20   9.   Venue is proper in this Court under 28 U.S.C. § 1391 and local rule 3-2(c) because

21   the events that gave rise to Representative Plaintiffs' claims took place within the Northern District

22   of California, San Jose Division's jurisdiction, and Southern Glazer does business in this Judicial

23   District and Division.

24

25   **REPRESENTATIVE PLAINTIFFS**

26   10.   Arena Restaurant and Lounge, LLC is a limited liability company located in San

27   Jose, California. It is referred to in this Complaint as "Arena." James C. Nguyen was the liquor

28   license holder for Arena.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

11.     Pacifica Restaurants, LLC is a limited liability company located in Del Mar, California. It is referred to in this Complaint as "Pacific Restaurants." It is a general partner of Pacifica Seafood Restaurant, a limited partnership located at 73505 El Paseo Ste F2608, Palm Desert, California ("Pacifica Seafood"), and Pacifica Cliffhouse, a limited partnership located at 78250 Highway 111, La Quinta, California ("Pacifica Cliffhouse"). Both Pacifica Seafood and Pacifica Cliffhouse are liquor license holders.

12.     Vine and Barrel, LLC is a limited liability company located in Petaluma, California. It is referred to in this Complaint as "Vine and Barrel." Jason Jenkins was the liquor license holder for Vine and Barrel.

13.     Room Service Fine Food & Liquor is located in San Francisco, California. Daniel Flores was the owner and liquor license holder for Room Service Fine Food & Liquor. He sold the business in June 2017. He is referred to in this Complaint as "Flores."

14.     During the relevant time period, these liquor license holders (collectively referred to herein as "Representative Plaintiffs") had accounts with Southern Glazer, wherefrom they and authorized agents thereof were permitted to purchase liquor using Representative Plaintiffs' respective liquor licenses (issued by the California Department of Alcoholic Beverage Control) and/or its Southern Glazer-issued account numbers.

15.     During the relevant time period, Representative Plaintiffs and/or their authorized agents repeatedly purchased liquor from Southern Glazer, using their respective ABC liquor licenses and/or Southern Glazer-issued account numbers.

16.     At all times relevant herein, Representative Plaintiffs were members of the Nationwide Class and the California Subclass.

17.     Representative Plaintiffs bring this action on behalf of themselves, and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons similarly situated and proximately damaged by the unlawful conduct described herein.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

**DEFENDANTS**

18.    According to Defendant's website,[1] "Glazer's Wholesale Distributors" (the predecessor to Glazer's, Inc.) was founded and began operations on or about the repeal of Prohibition in 1933 and has, in various corporate forms, distributed/sold food, drink and tobacco products on a wholesale basis in various states across the nation.

19.    In 1968, Southern Wine and Spirits of America, Inc. began distributing and selling food, drink and tobacco products on a wholesale basis in various states across the nation, including in California.

20.    In 2016, defendant Southern Wine & Spirits of America, Inc. merged with Glazer's, Inc., to form co-defendant Southern Glazer's Wine & Spirits, LLC, which continues to serve as a distributor/wholesaler of food, drink and tobacco products in various states across the nation, including California. At present, California constitutes the largest state market for Defendants.

21.    For all purposes relevant to this litigation, defendant Southern Glazer's Wine & Spirits, LLC is the successor in interest to co-defendant Southern Wine & Spirits of America, Inc. and to Glazer's, Inc.

22.    During the class period, employees/representatives of defendants Southern Glazer's Wine & Spirits, LLC and Southern Wine and Spirits of America, Inc. invoiced and/or sold wine, beer, and spirits to bars, restaurants, and liquor stores on behalf of said defendants under various labels and brands, including, but not limited to (1) Southern Glazer's Wine and Spirits of CA North, (2) Pacific Wine and Spirits of CA North, (3) American Wine and Spirits of CA North, (4) Transatlantic Wine and Spirits of CA North, (5) Southern Glazer's of CA North, (6) Southern Wine & Spirits of CA, (7) Pacific Wine & Spirits of CA, (8) Coastal Wine and Spirits of CA, (9) Golden State Wine and Spirits of CA, (10) American Wine and Spirits of CA, (11) Southern Wine and Spirits – Union City and/or (12) Southern Wine and Spirits Northern Cal. The identity of one or more of these additional entities appears on invoices sent by Southern Glazer to the Representative Plaintiffs.

---

[1]   http://www.southernglazers.com/about-us/

Third Amended Complaint for Damages, Restitution, and Injunctive/Equitable Relief

23.     Moreover, despite its unassuming presentation as a "family owned" business, Southern Glazer operates and distributes more than 150 million cases of wine and spirits annually to 350,000 retail and restaurant accounts across 44 States, the District of Columbia, Canada and the Caribbean, through the efforts of its claimed 20,000 employees. These realities support Southern Glazer's claimed status as the largest wine and spirits distributor in the United States.

24.     Moreover, as the dominant wine and spirits distributor in this nation, Southern Glazer successfully markets, promotes, merchandises, and distributes over 5,000 brands, and represents approximately 1,600 wine, spirits, beer, and beverage suppliers, both domestic and foreign.

## TOLLING OF THE STATUTE OF LIMITATIONS

**Discovery Rule Tolling**

25.     Class members had no way of knowing about Southern Glazer's unlawful sales and distribution scheme, including Southern Glazer's deception with respect to its unauthorized use of class members' accounts. For Representative Plaintiff Arena, Southern Glazer's deception was only discovered when Arena found that it had been assessed thousands of dollars in taxes for liquor supposedly purchased, but not actually purchased, from Southern Glazer. For Representative Plaintiff Vine and Barrel, Southern Glazer's deception was discovered through examination of falsified sales invoices. Plainly, Southern Glazer was intent on expressly hiding its behavior from regulators and consumers, making this the quintessential case for tolling.

26.     Within the time period of any applicable statutes of limitations, Representative Plaintiffs and members of the proposed classes could not have discovered, through the exercise of reasonable diligence, that Southern Glazer was concealing the unlawful conduct detailed herein.

27.     Representative Plaintiffs and members of the proposed classes did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Southern Glazer was abusing class members' accounts; nor would a reasonable and diligent investigation have disclosed that Southern Glazer was disclosing their account information to third-parties, and

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

1   facilitating unlawful transactions using class members' accounts, which was discovered by
2   Representative Plaintiffs only shortly before this action was filed.

3          28.    Nor, in any event, would such an investigation on the part of Representative
4   Plaintiffs and other class members have disclosed that Southern Glazer valued profits over
5   compliance with federal and state law, or over the trust Representative Plaintiffs and other class
6   members had placed in Defendants' representations, or of Southern Glazer's scheme to meet
7   quotas and secure business with particular manufacturers/producers by facilitating unlawful sales,
8   "samples," and/or outright gifts of liquor.

9          29.    For all these reasons, all applicable statutes of limitations have been tolled by
10  operation of the discovery rule.

11

**Fraudulent Concealment Tolling**

13         30.    All applicable statutes of limitations have also been tolled by Southern Glazer's
14  knowing and active fraudulent concealment and denial of the facts alleged herein throughout the
15  time period relevant to this action.

16         31.    Instead of disclosing its account information disclosure scheme, or that it was
17  making unauthorized sales using class members' liquor licenses, or of its disregard in various other
18  respects of federal and state law, Southern Glazer falsely represented that its practices complied
19  with federal and state standards governing the liquor industry and fair competition within interstate
20  commerce, generally, and that it was a reputable wholesaler whose representations could be
21  trusted.

22

**CLASS ACTION ALLEGATIONS**

24         32.    Representative Plaintiffs bring this action pursuant to the provisions of Rules 23(a),
25  (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the
26  following class and subclass(es) (collectively, the "classes"):

27

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

Third Amended Complaint for Damages, Restitution, and Injunctive/Equitable Relief

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

California Class:
"All persons/entities, within the State of California, who had an account with Southern Glazer's Wine & Spirits, LLC and/or Southern Glazer Wine & Spirits of America, Inc. within the applicable time period."

National Class:
"All persons/entities, within the United States of America, who had an account with Southern Glazer's Wine & Spirits, LLC and/or Southern Glazer Wine & Spirits of America, Inc. within the applicable time period."

33. Defendants, and their officers, directors and employees are excluded from each of the Plaintiff classes.

34. This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure Rule 23 because there is a well-defined community of interest in the litigation and membership in the proposed classes is easily ascertainable:

    a.   Numerosity: A class action is the only available method for the fair and efficient adjudication of this controversy. The members of the Plaintiff classes are so numerous that joinder of all members is impractical, if not impossible. Insofar as Southern Glazer's website claims that it employs over 20,000 team members, and distributes more than 150 million cases of wine and spirits annually to 350,000 retail and restaurant accounts, Representative Plaintiffs are informed and believe and, on that basis, allege that the total number of class members is in the tens or even hundreds of thousands of individuals/entities. Membership in the classes will be determined by analysis of Southern Glazer's open-account lists/business records.

    b.   Commonality: The Representative Plaintiffs and the class members share a community of interests in that there are numerous common questions and issues of fact and law which predominate over questions and issues solely affecting individual members, including, but not necessarily limited to:

    1)   Whether Southern Glazer had a practice of providing class members' account/license numbers to third-parties;

    2)   Whether Southern Glazer or its officers, managers, agents and/or other employees purchased liquor on class members' accounts, without their knowledge or consent, then failed to deliver said liquor to class members, or provide invoices documenting said transaction(s);

    3)   Whether Southern Glazer allowed third-parties to purchase liquor on class members' accounts, without their knowledge or consent, then failed to deliver said liquor to class members, or provide invoices documenting said transaction(s);

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

4)   Whether Southern Glazer's practices constitute fraud and/or a pattern of fraudulent activity;

5)   Whether Southern Glazer's practices constitute breach(es) of contract;

6)   Whether Southern Glazer violated California Business and Professions Code §§ 17000, *et seq.*, by engaging in below cost sales, using loss leaders, gifts, secret rebates, unearned discounts, and using threats or intimidation to effectuate such violations in order to injure competitors or destroy competition;

7)   Whether Southern Glazer violated California Business and Professions Code §§17200, *et seq.* by engaging in unfair, unlawful and/or fraudulent business practices;

8)   Whether Southern Glazer was unjustly enriched by, *inter alia*, allowing/permitting use of class members' account numbers and/or liquor licenses by third-parties, engaging in practices which engender unfair competition and/or other practices which threaten interstate commerce;

9)   Whether injunctive, corrective and/or declaratory relief and/or an accounting is appropriate;

10)  Whether Southern Glazer's conduct rises to the level sufficient to warrant an award of punitive damages.

c.   <u>Typicality</u>: The Representative Plaintiffs' claims are typical of the claims of the Plaintiff classes. Representative Plaintiffs and all members of the Plaintiff classes sustained damages arising out of and caused by Defendants' common course of conduct in violation of law, as alleged herein.

d.   <u>Adequacy of Representation</u>: The Representative Plaintiffs in this class action are adequate representatives of each of the Plaintiff classes in that the Representative Plaintiffs have the same interest in the litigation of this case as the class members, are committed to vigorous prosecution of this case and have retained competent counsel who is experienced in conducting litigation of this nature. The Representative Plaintiffs are not subject to any individual defenses unique from those conceivably applicable to other class members or the classes in their entirety. The Representative Plaintiffs anticipate no management difficulties in this litigation.

e.   <u>Superiority of Class Action</u>: Since the damages suffered by individual class members, while not inconsequential, may be relatively small, the expense and burden of individual litigation by each member makes or may make it impractical for members of the Plaintiff classes to seek redress individually for the wrongful conduct alleged herein. Should separate actions be brought or be required to be brought, by each individual member of the Plaintiff classes, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants. The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interests of other class members who are not parties to the adjudications and/or may substantially impede their ability to adequately protect their interests.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

**COMMON FACTUAL ALLEGATIONS**

**Post-Prohibition History of the Nation's Liquor Industry**

35.     Passage of the 18th Amendment to the Constitution in 1919 and the ushering in of Prohibition represented one of the darker periods in American history. While considered the crowning achievement of the Temperance movement (the social movement against the consumption of alcoholic beverages), crime rates and corruption soared under Prohibition and its resultant, often violent, black market for alcohol. These effects, coupled with what many historians cite as a likely *increase* in alcohol consumption during that period, led Congress to overturn Prohibition through passage of a 21st Amendment to the Constitution which was then overwhelmingly ratified by various state conventions in 1933.

36.     The Federal Alcohol Administration Act (27 U.S.C. § 201, *et seq*.) was enacted in 1935 to establish a regulatory scheme for the liquor industry.

37.     While, among other features, the 21st Amendment granted to States the right to maintain their own effective and uniform systems for controlling liquor transportation, importation and use, the Amendment did not give States the right to pass *nonuniform* laws that either discriminated against out-of-state goods or functioned in discordance with what is commonly referred to as the "three-tier system." (aka, "tied house" rules).

38.     For example, 27 U.S.C. § 205 sets forth "tied house" provisions and defines unfair competition and unlawful practices as:

> (b) "Tied house." To induce through any of the following means, any retailer, engaged in the sale of distilled spirits, wine, or malt beverages, to purchase any such products from such person to the exclusion in whole or in part of distilled spirits, wine, or malt beverages sold or offered for sale by other persons in interstate or foreign commerce, if such inducement is made in the course of interstate or foreign commerce, or if such person engages in the practice of using such means, or any of them, to such an extent as substantially to restrain or prevent transactions in interstate or foreign commerce in any such products, or if the direct effect of such inducement is to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to such retailer in interstate or foreign commerce: (1) By acquiring or holding (after the expiration of any existing license) any interest in any license with respect to the premises of the retailer; or (2) by acquiring any interest in real or personal property owned, occupied, or used by the retailer in the conduct of his business; or (3) by furnishing, giving, renting, lending, or selling to the retailer, any equipment, fixtures, signs, supplies, money, services, or other thing of value, subject to such exceptions as the Secretary of the Treasury

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

shall by regulation prescribe, having due regard for public health, the quantity and value of articles involved, established trade customs not contrary to the public interest and the purposes of this subsection; or (4) by paying or crediting the retailer for any advertising, display, or distribution service; or (5) by guaranteeing any loan or the repayment of any financial obligation of the retailer; or (6) by extending to the retailer credit for a period in excess of the credit period usual and customary to the industry for the particular class of transactions, as ascertained by the Secretary of the Treasury and prescribed by regulations by him; or (7) by requiring the retailer to take and dispose of a certain quota of any of such products.

(c) Commercial bribery. To induce through any of the following means, any trade buyer engaged in the sale of distilled spirits, wine, or malt beverages, to purchase any such products from such person to the exclusion in whole or in part of distilled spirits, wine, or malt beverages sold or offered for sale by other persons in interstate or foreign commerce, if such inducement is made in the course of interstate or foreign commerce, or if such person engages in the practice of using such means, or any of them, to such an extent as substantially to restrain or prevent transactions in interstate or foreign commerce in any such products, or if the direct effect of such inducement is to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to such trade buyer in interstate or foreign commerce: (1) By commercial bribery; or (2) by offering or giving any bonus, premium, or compensation to any officer, or employee, or representative of the trade buyer […]

39.     Fundamentally, the three-tier system provides that (1) producers cannot wholesale or retail alcohol, (2) wholesalers cannot be producers or retailers, and (3) retailers cannot wholesale or produce alcohol. Under the three-tier system, manufacturers (tier 1) sell to licensed importers, distributors and control boards. Federal Excise Taxes are collected when goods leave the premises of the manufacturer or the bonded facilities of an importer. Licensed importers and distributors (tier 2) act in cooperation with the federal and state governments; they help ensure that alcohol beverage taxes are reliably collected. The prohibition against tier 2 entities owning or operating retailers (those at tier 3), ensures that suppliers cannot coerce retailers to favor their brands. Moreover, importers, distributors and control boards are only allowed to sell to licensed retailers. Licensed outlets like liquor stores, bars or restaurants (tier 3) ensure that alcohol is sold to those who are of legal age to purchase it. Acting like a safety net, this three-tier regulatory system provides for "checks and balances" to the way alcohol is distributed and sold throughout the system, from one licensed tier to another. These tied house rules dictate that no individual or entity (except the state regulator itself) is allowed to own and operate more than one tier of the system.

40.     Indeed, California statutory authority supports these tied house rules. Specifically, Cal. Bus. & Prof. Code § 23501 declares, *inter alia*, that:

(a) The regulation and licensing of the sale of alcoholic beverages in this state has operated for over 80 years under what is commonly referred to as the "three-tier system," which generally prohibits vertical integration within the distilled spirits industry. This system has helped in protecting against undue marketing influences within the distilled spirits industry and assisted the goals of promoting temperance and reasonable regulation of the sale of distilled spirits within the state. In addition, this system has helped create thousands of jobs and billions of dollars in economic development within California.

41.     "Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws" *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, (1999) 20 Cal. 4th 163, 186 (citing *Atlantic Richfield Co. v. USA Petroleum Co.* (1990) 495 U.S. 328, 344.

42.     Like antitrust laws, the primary purpose of predatory pricing laws is consumer protection. *Id.* at 185. Defendant's conduct is designed to injure competition by disrupting the market in its favor: promise below-cost sales and unlawful tie-ins to reward loyal retail customers and punish disloyal ones.

43.     The import of these laws is multi-fold; ensuring vertical and horizontal parity between all parties within the liquor industry (i.e., disallowing participation in more than one tier) engenders equitable treatment (e.g., consistent pricing levels, reasonable availability of product) of those entities on other tiers (parity), discourages corruption and monopolistic practices, and promotes healthy and fair competition within interstate commerce. These goals are consistent with, and in some cases codified in, the Sherman Antitrust Act (15 U.S.C. § 1, *et seq*.), and the Robinson-Patman Act (15 U.S.C. § 13).

**The Advantages of Exclusive Supplier Contracts Include Significant Bargaining Power, Market Share, And Revenue**

44.     Despite the intended protections provided by federal and state laws, Southern Glazer has thrived in the three-tier system, developing unscrupulous, unethical and unlawful schemes that increase revenues, profitability, and market share. These practices have given

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1   Southern Glazer an unfair competitive advantage over its competition with a resultant

2   disadvantage to the public and class members.

3        45.   It is common practice in the alcohol industry for an alcohol manufacturer (tier 1) to

4   designate only one wholesaler (tier 2) per geographic area—that designation generally being made

5   based on the level of sales achieved by the particular wholesaler. Once chosen, alcohol retailers

6   (tier 3) are forced to buy that manufacturer's product(s) exclusively through its chosen wholesaler,

7   or not buy it/them at all. Not only have these schemes served to directly increase Southern Glazer's

8   profits, they also secure highly-desirable and highly-profitable supply relationships. This exclusive

9   right to distribute particular alcohol brands, such as Bulleit, Campari, Skyy, and Johnnie Walker,

10  creates significant incentives for Southern Glazer to take all measures, lawful or unlawful, to

11  guarantee continuation of these relationships.

12       46.   During the class period, Southern Glazer enjoyed numerous exclusive contracts

13  with alcohol manufacturers/producers, with a resultantly larger client base, more orders therefrom,

14  and higher profitability.

15       47.   Representative Plaintiffs were required to purchase, knowingly and/or

16  unknowingly, products to help Southern Glazer meet sales quotes and thereby continue to enjoy

17  exclusive contracts.

18

19  **Liquor License/Account Application Process**

20       48.   Owners of bars, restaurants, and liquor stores wishing to engage in the retail sale of

21  alcohol will find a process for obtaining a liquor sales license that is highly regulated, and for

22  which the grounds for suspensions and/or revocation of those licenses are numerous.[2]

23       49.   Applying for a California liquor license includes submission of documentation of

24  business status, an individual financial affidavit, totals of investments in the business, banking

25  information, and undergoing a background check. After submitting the required documents,

26  completing the notification process (by posting notice in a conspicuous place at the entrance to the

27

28   [2]   (e.g., *see* California's Dept. of Alcoholic Beverage Control's penalty guidelines and
schedule at http://www.abc.ca.gov/trade/Penalty%20Guidelines.pdf)

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

premises, as well as by mail and/or newspaper, dependent on the type of license sought, pursuant to Cal. Bus. & Prof. Code §23985, *et seq.*), a party may be approved for a license (note that, if the intended licensee wishes to sell hard-liquor, it must purchase a hard liquor license from another current licensee or participate in California's annual lottery program and hope for the best, as new licenses are not otherwise being issued). A unique liquor license number is then issued for the particular bar/restaurant/liquor store. In California, this number is registered with the State Board of Equalization, so that the Board can collect taxes on retail sales of alcohol. The Board is empowered to conduct audits to "determine whether or not the amount of tax has been reported correctly based on relevant tax statutes, regulations, and case law." 18 CCR § 1698.5. Other states have similar processes.

50.     To a bar/restaurant/liquor store owner who wishes to sell alcohol to its patrons, obtaining and maintaining a liquor license has tremendous value.

**Becoming a Southern Glazer Customer**

51.     For licensees (i.e., the class members herein) desirous of obtaining liquor from Southern Glazer for resale, the process is standardized. After approaching Southern Glazer for this purpose, class members were required to submit evidence of their liquor licenses, and various forms including:

a.     Credit application;
b.     Personal guarantee;
c.     Appendix A California resale certificate;
d.     Optional e-check authorization/autopay and proof of deliver forms;
e.     Direct Warehouse Sales Authorization form, which lists the authorized purchasers for the retailer;
f.     Copies of state-issued beverage licenses and Certificates of Resale.

52.     Once these papers were approved, each class member was given a unique account number which the class members could then use to purchase liquor from Southern Glazer. Membership in one or both of the Plaintiff classes requires persons/entities to have submitted such forms, have had such forms approved by Southern Glazer and been issued thereby a unique Southern Glazer account number.

**Retailers Do Not Expect to Make and/or Be Charged for Unauthorized Purchases**

53.    Class members expected to only be charged by Southern Glazer and the proper taxing authorities for alcohol purchases *actually made* from Southern Glazer. Class members did not expect Southern Glazer to charge them for alcohol class members did not order and/or for Southern Glazer to report to taxing authorities unauthorized alcohol sales.

54.    Consistent with 4 CCR § 17, class members expected Southern Glazer to provide an accurate invoice for every alcohol sales transaction between them and for Southern Glazer to take orders for alcohol only from those individuals authorized by class members to place such orders.

55.    Representative Plaintiffs and members of both classes did business with Southern Glazer based upon these expectations.

56.    Moreover, the agreements between class members and Southern Glazer contained additional express and/or implied promises by Southern Glazer upon which class members reasonably relied, including, but not necessarily limited to the promises that:

a.    Southern Glazer would not disclose class members' account numbers and/or liquor license numbers for reasons other than those identified in its agreements therewith and, in those situations, only to the extent necessary to effectuate the lawful purpose(s) therefor;

b.    Southern Glazer would not use class members' account numbers and/or liquor license numbers to the financial detriment of class members;

c.    Southern Glazer would not add so-called authorized purchasers to class members' Direct Warehouse Sales Authorization to Purchase Forms, without class members' knowledge and consent;

d.    Southern Glazer would not contract with third-parties to use class members' account numbers and/or liquor license numbers to the financial detriment of class members;

e.    Southern Glazer would not engender unfair competition between its account holders (class members) and/or between account holders and unlicensed third-parties;

f.    Southern Glazer would not undermine class members' profits by giving away liquor, and/or selling liquor at lower prices to (licensed or unlicensed) third-parties/competitors, and/or a combination of these practices;

g.    Southern Glazer would not engage in conduct which it knew and/or had reason to know would increase class members' tax liabilities to state and/or federal taxing authorities;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

h.      Southern Glazer would not engage in conduct which it knew and/or had reason to know would cause class members to misstate their tax liabilities in tax returns and/or internal documents (e.g., profit & loss statements);

i.      Southern Glazer would not engage in conduct which it knew and/or had reason to know would require class members to re-state/correct tax returns and/or correct internal documents, and incur legal and/or accounting fees in doing so;

j.      Southern Glazer would not demand that class members purchase certain amounts of liquor, or specific varieties of liquor, at the risk of class members' alcohol supply being cut off;

k.      Southern Glazer would comply with 4 CCR §17 and provide class members with an invoice for every transaction containing, *inter alia*, name and address of the purchaser, the type and quantity of liquor ordered, the cost to the purchaser and method of payment, the date of sale and invoice number. Indeed, this expectation of class members was predictable to Southern Glazer given that Southern Glazer knew and/or had reason to know that class members commonly relied on such invoices to determine the type and quantity of liquor received/purchased and determine their business' tax liabilities.

**Southern Glazer Falsely Markets Itself as a Responsible Distributor**

57.      Southern Glazer touts itself as a "sales and distribution organization with a proud history of consistently delivering impeccable service." It is an industry behemoth, generating nearly $17 billion in revenues from the sale of 150 million cases of wine and spirits to 350,000 retail and restaurant accounts in 2016.

58.      It identifies its values[3] as follows:

F   -   Fulfill the potential of our suppliers and customers
A   -   Aspire to excellence
M   -   Mission and Vision driven
I    -   Integrity and inclusiveness are our hallmarks
L   -   Leadership in everything we do
Y   -   You are critical to our success

59.      However, Southern Glazer's routine business practices are anything but a legitimate source of pride, as detailed throughout this Complaint and as a rudimentary Google search reveals.

---

[3]      http://www.southernglazers.com/about-us/#/Our-Mission

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

60.     For example, in July 2017, "Southern Glazer's Wine and Spirits of Pennsylvania agreed to pay $5 million in monetary penalties for their employees' role in providing cash, all-expenses paid trips, tickets to shows and sporting events, entertainment and other things of value to officials at the PA-LCB from 2000 to 2012."[4]

61.     Southern Glazer and its related entities have also been punished and/or charged with racial discrimination,[5] illegal kickbacks,[6] unlawful carrying charges,[7] and other unethical business practices.

62.     More recently, a former Southern Glazer Vice President and National Account Manager for Walmart/Sam's Club filed suit in Arkansas state court for wrongful termination and defamation, stemming from, *inter alia*, his "unwillingness to engage in collusive, anti-competitive, illegal and deceptive conduct and his complaints concerning the same."[8] Thompson alleges, and attaches as exhibits to the Complaint, substantial evidence of the conduct Representative Plaintiffs allege here, such as:

   a.     Secret rebates (Dkt. 1-1, ¶¶ 26-28)

   b.     Paying scans to meet sales quotas (Id., ¶ 30).

   c.     Inequitable pricing practices, "creating uncompetitive retails" (Id., ¶¶ 34, 51-54)

   d.     Collusive pricing and sales tactics (Id., ¶¶ 36-42)

   e.     Providing and/or requiring shelf level merchandising support (Id., ¶ 43)

   f.     Below-cost sales/gifts (Id., ¶¶ 45-48)

[4]   https://www.justice.gov/usao-mdpa/pr/four-vendors-pa-liquor-control-board-agree-pay-over-9-million-monetary-penalties

[5]   https://www.dol.gov/newsroom/releases/ofccp/ofccp20170109

[6]   http://www.winespectator.com/webfeature/show/id/Feds-Settle-Wine-Kickback-Case-in-Illinois_4547

[7]   *Wiseman Park, LLC v. Southern Glazer's Wine & Spirits, LLC,* 16 Cal. App. 5th 110 (2017).

[8]   *Thompson v. Southern Glazer's Wine & Spirits LLC*, Case No. 04CV-17-2047 (Circuit Court of Benton County, Arkansas).

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

**Southern Glazer's Violations of Law**

63.    Representative Plaintiffs and members of both classes entered into contracts with Southern Glazer reasonably relying on Southern Glazer to honor these duties and obligations.

64.    In breach of these duties, warranties, express and/or implied promises, and contrary to the reasonable expectations of class members, Southern Glazer committed various unlawful and/or unfair business practices, including, but not necessarily limited to:

a.    Adding so-called authorized purchasers on Representative Plaintiffs' and class members' Direct Warehouse Sales Authorization to Purchase Forms, without their knowledge or consent;

b.    Leading Representative Plaintiffs and members of both classes to misreport their tax obligations to state and/or federal taxing authorities;

c.    Compelling Representative Plaintiffs and members of both classes to re-state their tax obligations for prior tax cycles to state and/or federal taxing authorities, and to incur time and expense in retaining legal and financial professionals therefor;

d.    Selling liquor to bars/restaurants/clubs that do not possess liquor licenses using Representative Plaintiffs' and class members' liquor license numbers and/or their Southern Glazer account numbers;

e.    Singling out customers who pay C.O.D. and/or are known to maintain poor accounting practices (e.g., for "ghost shipping" and/or "phantom invoicing" practices), causing them monetary damages and/or tax liabilities;

f.    Selling liquor to third-parties on Representative Plaintiffs' and class members' accounts at lower prices than to legitimate/licensed purchasers;

g.    Selling liquor to different parties at different prices, in violation of federal alcohol regulations and state and/or federal law;

h.    Permitting its officers, managers, agents and/or other employees to purchase liquor on Representative Plaintiffs' and class members' licenses/accounts, using cash and/or charging class members for the liquor, then storing (i.e., not delivering) it in order to meet quotas (and in violation of 4 CCR § 76);

i.    Permitting its officers, managers, agents and/or other employees to give away liquor, by pricing such at $.01;

j.    Permitting its officers, managers, agents and/or other employees to give away liquor by printing sample labels for full regular-sized bottles;

k.    Permitting its officers, managers, agents and/or other employees to purchase liquor using class members' liquor license numbers and/or their Southern Glazer account numbers, temporarily store the liquor (in violation of 4 CCR § 76), then returning the liquor later, in order to meet quotas, oftentimes without refunding the money;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

l.  Using so-called "A Forms" (which lack bar codes and invoice numbers and are, thus, nearly impossible to locate) to facilitate liquor transactions, in violation of 4 CCR § 17;

m.  Not providing annual invoices, unless requested, in order to conceal the practices cited herein;

n.  Permitting its officers, managers, agents and/or other employees to purchase liquor "off-invoice";

o.  Permitting its officers, managers, agents and/or other employees to sell "off-invoice" liquor to retailers without licenses, or to retailers who will then resell the liquor to other retailers, in violation of state and/or federal law;

p.  Permitting its officers, managers, agents and/or other employees to sell "off-invoice" liquor to private individuals, in violation of state and/or federal law;

q.  Threatening to cut off supplies to customers who do not buy a sufficient quantity of liquor, or liquor of select varieties;

r.  Refusing to sell products to class members without them purchasing "tie-ins" (other types of liquor than those the customer wishes to purchase);

s.  Giving kickbacks, free samples and other unlawful incentives to restaurants/retailers (in violation of, *inter alia*, 4 CCR § 106), in order to keep them from reporting the violations specified above;

t.  Working and/or conspiring with third-parties to allow for the unfair/unlawful practices above and below;

u.  Ignoring complaints from sales representatives and/or retailers about the unfair and unlawful business practices detailed herein.

v.  Unlawfully manipulating a "will call" system to effectuate unauthorized purchases and deliveries, collecting money from retailers vis-à-vis an automatic payment system.

65.  Representative Plaintiffs are informed and believe and, on that basis, allege that Southern Glazer has actual and/or constructive knowledge of all of the practices listed above, and that it willfully permitted them to continue in order to meet quotas (and, thus, maintain its business relationships with producers) and increase profits, in violation of state and/or federal law.

66.  Representative Plaintiffs are informed and believe and thereon allege that many (if not all) of Southern Glazer's practices listed above and throughout this Complaint have a substantial impact on interstate commerce.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

**The First-Hand Knowledge of Putative Class Members and Southern's Own Employees Evidence the Violations Described Herein**

67.     During the class period, a current California business owner and Southern accountholder was approached numerous times by the Southern sales representatives assigned to his territory and was given free samples of items that this accountholder had purchased many times in the past. On dozens of occasions during the class period, this accountholder was subject to Southern's "tying" practices whereby he was approached by Southern's sales representatives and told that he would not be allowed to buy the alcohol he needed for his business unless he purchased other products he did not want (e.g., he was told he had to buy Sonnet white wine so as to get permission to buy Sonnet red; he was told he had to buy Meomi pinot noir so as to get permission to buy the more popular Meomi "Clark and Telephone"; he was told he had to buy Roederer champagne to get permission to buy Cristal champagne). This accountholder was also billed numerous times for alcohol he did not order, and on many occasions, he complained to Southern about being charged for products he did not order. In response to at least one of these complaints, Southern sent a couple of very intimidating representatives to this accountholder's business, who then aggressively confronted the accountholder by saying "f***ing buy this or we're gonna have a problem" (or words very close thereto) and causing fear and anxiety to the accountholder. Other times, according to this Southern accountholder, Southern representatives visited his business bringing samples items he already sold. As a result of Southern's own records, these Southern representatives would have known that the "samples" they were bringing were, in fact, just free alcohol for the accountholder.

68.     During the class period, yet another witness to Southern's fraudulent, anti-competitive conduct worked for Southern as a Sales Representative and District Manager ("DM"). This DM witnessed Southern's salesforce penalizing and retaliating against Southern's accountholders who "pushed back" against Southern's unlawful practices. For example, this DM witnessed other Southern sales representatives telling accountholders that particular products were out of stock (when the products were not out of stock) in situations where the accountholders did not wish to buy either (1) the mix of products being pushed/offered by the sales representatives

and/or (2) the amount of product the sales representatives desired so as to make the sales representatives' quotas. Moreover, this DM routinely witnessed Southern's sales representatives engaged in a practice called "blind billing" whereby a sales representative who was otherwise unable to make his/her quota at the end of the month on any particular product(s) would pick numerous different accountholders' account numbers and divvy up the amount of product he/she desired to sell (to meet the sales representative's quota) and generate bills to those accountholders for that product. Generally, this practice generated an invoice, which would, in turn, result in unwanted liquor being delivered to the accountholders. On other instances, this DM witnessed the generation of altogether fake invoices—disproportionately aimed at very small Asian markets for expensive products like Opus One and Dom Perignon. In many of these occasions, the blindly billed items were not delivered to the accountholders but were, instead, paid for with cash by the sales representative who perpetuated the fraud and would then be resold elsewhere. This DM was further aware of one particularly egregious fraud occurring in Southern Texas operations whereby the sales representatives in that territory generated fake invoices to AAFES (the Army and Air Force Exchange Service) a third-party government contractor and large Southern accountholder. In that instance, Southern's sales representatives billed AAFES for liquor it never ordered or received. AAFES failed, at least at first, to notice the fake bill and, instead, paid Southern's invoices for the un-ordered/un-shipped alcohol. Rather than deliver the product to AAFES, this DM explains that the sales representatives put the liquor invoiced to AAFES into their cars and resold it to unrelated third parties. According to this DM, sales representatives' monthly and fiscal year sales quotas, as well as sales results documentation are routinely reviewed by upper level management—evidencing that the fraud this DM describes is systemic across Southern's operations.

69.     During the class period, yet another Southern sales representative observed fellow Southern sales representatives give accountholders free televisions, free wine and free shipping thereof to these accountholders homes. During the class period, this sales representative observed other Southern representatives send so-called "Depletion Report" to Southern suppliers, boasting to these suppliers that Southern had achieved it sales goals for the suppliers' products (when

Southern had not, in fact, done so). Thereafter, some of these Depletion Reports were corrected and the results listed thereon lowered (evidencing the actual sales levels), and yet the corrected reports were intentionally kept from the supplier(s). Further, this sales representative observed Southern "future invoicing" accountholders so as to meet sales goals. On one such occasion, this sales representative overheard one of Southern's Vice Presidents telling a Southern accountholder that Southern was going to invoice the accountholder for over 50 cases of wine product but not ship the product. This witness also observed Southern sales representatives giving to accountholders free cases of alcohol if they would buy other products, again, so as to meet sales quotas.

70.     During the class period, a Southern administrative employee who was responsible for, *inter alia*, scanning Southern financial documents and invoices noticed that, as a regular practice, Sothern sales representatives failed to generate Credit Memos (the documentation that reverses sales invoices for sales that were never made, of liquor that was never distributed to Southern accountholders). According to this witness, Sothern sales representatives frequently used what are known as "A Forms" instead of Credit Memos since the use of "A Forms" left sales figures appearing high (i.e., left Southern's record reflecting that products had been sold when they, in fact, had not been sold). This administrative employee also saw restaurants regularly billed for liquor they never received and was told by members of Southern's management team that one motivation for this practice was to insure Southern Glazer's sold enough quantity of a certain product (e.g., Pernod Ricard) to keep that account/product. This administrative employee overheard many of the company's weekly ("Friday") meetings between local sales representatives and Southern management members at which time these Southern management members demanded the sales representatives reach their sales numbers—and ordered them to stay at work until they did. Before they could leave, many of these sales representatives recorded phony sales which were then oftentimes reversed the next week—and yet, while this practice was known to management, it was not denounced thereby, despite having ample documentation to demonstrate the fraud. What's more, according to this witness, in yet other instances, the phony sales were never reversed, prompting (at least on some occasions, as witnessed by this administrative

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1970 BROADWAY, NINTH FLOOR
THE TOWER BUILDING
OAKLAND, CA 94612
TEL. (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

employee) the Southern accountholders to call and complain about being billed for liquor never received. This administrative employee answered many of these incoming calls from disgruntled accountholders. In many instances, these accountholders remained responsible for the bills, despite having never received the alcohol. When Southern management was informed of this pattern of activity, Southern sometimes hid any available paperwork of the transaction (it was this employee's job to track all such paperwork meaning that she, thus, uncovered many of these instances of hidden invoices) and/or intentionally misfiled it (such that finding it in Southern's enormous database was nearly impossible). On more than one occasion, this administrative employee's own manager ordered her to hide the relevant paperwork, prompting the administrative employee to complain to other members of Southern management—again, to no avail. On at least one of these occasions wherein this administrative employee complained to management of this unlawful conduct, she was told "it is none of your business." On yet other occasions, this administrative employee witnessed liquor sales to parties not holding liquor licenses. On one such occasion, an individual (a waitress for one of Southern's accountholders but commonly known not to be an authorized purchaser for the particular accountholder) came into one of Southern's facilities, asked to buy some wine for her personal use, was sold the wine, and yet Southern's management thereafter instructed Southern's accounts receivable department to collect payment from her. Finally, this administrative employee, on more than one occasion, observed Southern employees/managers giving bribes in exchange for help with liquor licensing issues (e.g., one such instance involved the giving of 8-9 cases of premium liquor) and, another time, in exchange for the accountholder permitting Southern to be the featured distributor at cruise ship events.

71.     During the class period, yet another Southern accountholder and owner of multiple businesses was told by Southern sales representatives that this accountholder was required to buy particular less desirable alcohol products in order to maintain access to the more desirable ones (aka, unlawful "tying"). This practice left this accountholder with substantial inventory for which he paid but could not ultimately sell.

72.     During the class period, yet another witness to Southern's fraudulent, anti-competitive conduct worked for Southern as a customer service department employee ("CSR").

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

1    Among other duties, one of this CSR's basic functions was keying in liquor sale orders from

2    accountholder. For the years this CSR held this job position, the CSR witnessed members of

3    Southern's management team instruct Southern sales representatives to add cases of product to

4    existing accountholders orders (i.e., over and above what the accountholders had actually ordered).

5    In response to many of these fake sales, this CSR received numerous calls from accountholders

6    (e.g., Olive Garden, Walmart, Kroger's, Target) as well as from many smaller, family-owned

7    businesses complaining that they received liquor they did not order. Additionally, many of these

8    accountholders complained that, since their discovery of the [fraudulently-ordered] alcohol—and

9    these accountholders' resultant return requests for it—was long after expiration of the legal grace

10   period for the return of alcoholic beverages, they were now stuck paying for it.

11        73.    During the class period, yet another Southern sales representative (this one based

12   out of Dallas, Texas) handled accounts for restaurants such as Ruth's Chris Steak House, Osteria

13   PaneVino, The Hub, The Oceanaire Seafood Room Malarkey's Tavern, Logie's, Vickery Park,

14   Marriott, Whiskey Cake, The Big Nine, The Corner Bar and Grille, Another Broken Egg Café,

15   and The Crawfish Patio. During this sales representative's tenure with Southern, company

16   executives Fran Baker, Matthew Orth and Eddie Eakin, and Sales Managers Lauren Rine and Brett

17   McDaniels conducted weekly ("Monday") meetings with this sales representative and her sales

18   teammates (as many as 12 to 15 fellow sales representatives). In these meetings, Fran Baker and

19   Matthew Orth repeatedly directed the sales team to use Southern-provided bank cards to "buy

20   back" the cost of liquor from those accountholders who'd previously bought liquor from Southern.

21   These company executives further explained that these accountholders would be allowed to keep

22   the previously-provided liquor (thus, giving the accountholders that liquor for free). In furtherance

23   of this unlawful scheme to provide free liquor and other items of value, Southern executive Fran

24   Baker provided this particular witness/sales representative (and her sales teammates) bank cards

25   co-branded with U.S. Bank so as to give money to certain accountholders in the manner set forth

26   above. On or about April 2017, company executive Fran Baker provided this sales representative

27   with three U.S. Bank bank cards to distribute funds to certain accountholders in the manner set

28   forth above. These bank cards included a Rewards Card in the name of Campari 500," a Rewards

---

1   Card in the name of "Teq Takeover GN 250," and a Rewards Card in the name of "Zamaca 100."
2   The accountholders receiving these payments included Ruth's Chris Steak House, The Oceanaire
3   Seafood Room, and Marriott. This sales representative's direct sales manager, Lauren Rine,
4   regularly directed this sales representative to give free alcohol to her accountholders (e.g., Ruth's
5   Chris Steak House, Whiskey Cake). According to this witness, liquor manufacturers'
6   representatives, including those from Azar, Campari and Dulce Vida, rode with this sales
7   representative to visit her accountholders (i.e., roughly three to four times per month). With the
8   knowledge of Southern management members, these liquor manufacturer representatives made
9   direct liquor sales transactions with this sales representative's accountholders and offer the
10  accountholders gifts, such as "shot machines," valued in the hundreds of dollars. Certain
11  accountholders managed by this sales representative (e.g., Corner Bar and Grille, Another Broken
12  Egg Café, The Crawfish Patio) routinely contacted this sales representative during the class period
13  reporting that they were charged for liquor from Southern that they did not order. According to
14  this sales representative, this "unordered" liquor was typically placed (via the signature and
15  authorization of Southern upper management member, John Heard) on the accountholders'
16  accounts at the end of the month. Upon discovering this fraud, this sales representative often
17  requested a refund to her accountholders' accounts, and yet the accountholders (e.g., The Crawfish
18  Patio) were nevertheless stuck with the liquor as well as the bill since their discovery of the fraud
19  occurred after expiration of the legal grace period for the return of alcoholic beverages.

20      74.     During the class period, a winery representative for a (Tier I) producer whose
21  product was distributed by Southern routinely reviewed her winery's "account sold list." This list,
22  among other things, tracked the retailers/end users to whom the winery (through its distributor,
23  Southern Glazers) sold products. Upon her reviewed her winery's "account sold list," this winery
24  representative discovered that some of the Southern accountholders appearing on the "account sold
25  list" did not even carry the winery's products—meaning that Southern was claiming sales that
26  were being illegally made to completely unrelated parties, or sales made to Southern
27  accountholders without the alcohol being delivered thereto (e.g., unlawfully garaged by Southern
28  sales representatives, etc.).

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

75.     During the class period, yet another witness to Southern's fraudulent, anti-competitive conduct worked for Southern as an On-premise sales representative. For the several years he held this position, he observed Southern personnel providing Southern's accountholders' account numbers to altogether third parties. Moreover, according to this sales representative, Southern routinely allowed its salespeople to engage in "off-invoicing" (a term well-known in the liquor distribution industry) due to the enormous pressure Southern placed on its salespeople to make quotas in almost any way possible. According to this sales representative, Southern salespeople routinely sold alcohol off-invoice and management knew it (since, by doing so, the salespeople were able to make their 80-100 per month quotas and protect Southern's extraordinarily-valuable, exclusive contracts with producers). By this method, off-invoicing engendered unfair competition between Southern and its competitors by shutting those competitors out of the market to buy from these same alcohol producers, thereby increasing Southern's market share of these exclusive contracts and, finally, thereby moving Southern closer toward achieving a monopoly over the national (Tier II) distribution of alcohol. Of the various forms of off-invoicing, this sales representative observed Southern salespeople ordering product as "will call" items on various accountholders' account numbers with the intention of delivering the same products either to entirely unrelated accountholders or to persons not holding liquor licenses (collectively referred to as the "Actual Recipient"). In this scheme, once the fraudulent order was placed, the Southern salesperson would travel to Southern's warehouse, pick up the alcohol, then deliver the alcohol to the Actual Recipient who would give cash to the Southern salesperson. Then, the Southern salesperson would rush back to Southern's facility, and pay the invoice with the cash he/she just received (and before it got billed to the defrauded accountholder). Actual Recipients, especially those with no liquor license at all, can benefit from off-invoicing in at least two ways: (1) they avoid sales tax obligations, and (2) they avoid income tax obligations (because the off-invoiced alcohol never appeared on the Actual Recipients' books to begin with). This sales representative witnessed each of these forms of off-invoicing occurring at his facility, all with the apparent knowledge and consent of management since the practice was widely-known around the facility. In this way, with respect to the recipients of this special, anti-competitive treatment,

1   Southern is also complicit in, solicits, and aids and abets a fraud upon the relevant taxing

2   authorities.

3          76.     During the class period, yet another witness of and victim to Southern's fraudulent,

4   anti-competitive conduct was a Southern accountholder and, while a Southern accountholder,

5   placed at least two orders form alcohol products therefrom per week. During this period, this

6   accountholder experienced a litany of unlawful conduct as described herein, including being told

7   by Southern sales representatives that he was required to purchase certain less desirable products

8   in order to maintain access to more desirable ones. Under this threat of damage to his business, he

9   made these unwanted purchases which then left this accountholder with substantial inventory that

10  he paid for but could not sell. For example, in order to purchase Stoli (a popular premium vodka),

11  his Southern sales representatives required he purchase flavored vodkas (i.e., vodkas that this

12  accountholder did not want since, at least to this accountholder's clientele, they did not sell well).

13  According to this accountholder, Southern's sales representatives also occasionally provided him

14  with free merchandising products, such as branded shelving and displays. Additionally, there were

15  many times this accountholder encountered discrepancies on invoices (i.e., products that he did

16  not purchase were listed there). There were many instances wherein Southern's sales

17  representatives forced this accountholder to buy extra alcohol to get the sales representatives'

18  numbers up (the accountholder was told he had to do so as to receive better pricing on other orders).

19  Southern's sales representatives offered to sell this accountholder liquor off the books, via cash

20  purchases.

21         77.     During the class period, Southern set multiple levels (as many as five different

22  levels), according to yet another witness who also saw and overhead members of Southern's

23  management team (e.g., Brad Vasser, President, and John Wittig, EVP) coach sales representatives

24  to engage in this unfair competition of offering different pricing for different customers. According

25  to this witness, when some accountholder being charged the higher rates (e.g., Publix Super

26  Markets) complained and/or refused to pay the higher prices than their competitors, Southern sales

27  representatives boycotted those complaining accountholders altogether and would not sell to them,

28  refused to offer these accountholders preferred delivery days and/or charged them additional

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

delivery fees. Southern engaged in these unlawful pricing tactics with brands such as Bacardi's "portfolio products," Campari, Aperol, Skyy vodka, Stoli, Kim Crawford wine, Constellation's "portfolio products," Moet, Hennessy, Dom Perignon, and Veuve Clicquot. This witness also observed Southern sales representatives engaged in "tying" practices with accountholders (e.g., requiring them to buy Absolut lime—an unpopular product—or not be sold other products they needed for their businesses).

78.     During the class period, yet another California business owner and Southern accountholder was charged roughly $26,000 by Southern for alcohol he did not order. During this same time period, this accountholder was subjected to unlawful "tying" practices whereby he was told by his Southern sales representative that he would not be permitted purchase Martel Cognac unless and until he purchased two cases of another promotional product (i.e., one that he did not want).

79.     During the class period, yet another Southern sales representative was told by her sales manager to bill Southern accountholders for liquor they did not order and was not delivered. When the sales representative questioned with concern this practice, she was told by her sales manager that since these particular accountholders are not "corporate accounts," the unlawful practice should continue since it was less likely that these smaller accountholders would be closely examining their invoices. Further, this sales representative observed cash bribes given by Southern sales representative to induce restaurants to purchase liquor (e.g., she saw $1,500 being given to the manager of a local steakhouse). Further, this sales representative was told by Southern management to (herself) buy Sky Vodka Rainbow in the event she could not sell enough of it to accountholders, so as to prove that Southern was successfully "placing" the product. Finally, this sales representative charged customers for more cases of liquor (e.g., Bogle Wine) than these customers actually purchased. She was told this was an accepted practice by members of Southern's management team.

80.     During the class period, yet another individual ("Third Party") was allowed to purchase alcohol from a Southern sales representative using another Southern accountholder's identifying number. When the victimized accountholder brought this to the attention of Southern,

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

the company attempted to cover up the scheme by generating and producing a falsified document allegedly evidencing that the Third Party was, in fact, an authorized purchaser on the accountholder's account. Among other benefits, Southern gave this Third Party trips to Lake Tahoe.

81.     During the class period, another California District Manager (and others at his location) engaged in "Ghost Shipping." Ghost shipping can take at least three forms. The first form of Ghost Shipping occurs when a Southern sales representative knowingly ships alcohol products without the accountholder's knowledge in hopes that the accountholder will not notice the extra/unordered product yet be charged for the product anyway. Notably, in situations wherein the accountholder ultimately discovers the unrequested product, it is usually too late to return it (per Southern's limited return polices and liquor laws which require requiring alcohol be returned within a short time window after its "purchase"). The second prevalent form of Ghost Shipping occurs when a Southern sales representative, so as to meet quotas set by Southern, uses an accountholder's account number to order a particular quantity of the quota product, but the product is not shipped at all to the accountholder. Instead, the quota product is left at "Will call" (at Southern's warehouse). In this instance, since the accountholder is not generally aware of the so-called "sale," he/she does not know to go pick up the product, and the product is subsequently returned to Southern's inventory. In this scenario, the transaction is reflected as an order on the accountholder's account, resulting in an inconsistency between the accountholder's records and Southern's records, and giving rise to review, audit and/or the imposition of tax obligations. The third prevalent form of Ghost Shipping is also known as "Trading." In Trading, the Southern sales representative knowingly uses Southern accountholders' account numbers to create invoices for products Southern has set a sales quota. The Southern sales representative picks up the quota product from Southern's warehouse and pays cash for it. Instead of delivering the quota product to the proper accountholder, however, the sales representative stores the product (e.g., in the sales representative's garage) yet delivers another product (one that the accountholder actually uses) from the sales representative's personal inventory. By doing so, the accountholder's records and Southern's records become inconsistent and, in some cases, the accountholder is charged for the

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

garaged product. According to this District Manager, Ghost Shipping exposes accountholders to sales tax obligations, audits, and inconsistent recordkeeping—independent violation of, *inter alia*, 4 CCR §§ 17 and 76 and 18 CCR § 1698.5. This California District Manager (and others at his location) engaged in all three of these forms of "Ghost Shipping." During the class period, this California District Manager (and others at his location) engaged in giving away of alcohol for free, unlawfully affixing stickers to bottles of alcohol and labeling them "samples." These individuals then gave away these free "samples" to existing Southern accountholders, despite the fact that these accountholders had already sampled and/or even maintained long histories of purchasing these particular products. During the class period, this California District Manager and/or others at his location engaged in unlawful "tying" practices, whereby they withheld alcohol products from Southern accountholders in response to these Southern accountholders unwillingness to purchase other, otherwise unwanted (i.e., "tied") alcohol products. As a general rule, the "tied" products were largely undesirable products which Southern needed to clear out of inventory and/or otherwise "push" onto its customers (i.e., for profitability, generally, so as to satisfy Southern's exclusive right-to-sell contracts with alcohol producers and to reduce competition by other Tier II companies).

82.    During the class period, yet another Southern accountholder noticed that he was being charged higher rates for alcohol products such as Veuve Clicquot French Champagne than his competitors. He brought this to the attention of his Southern sales representative and asked that the prices be lowered. In response to this complaint, the Southern's sales representative refused, but then delivered roughly a case of unrelated wine for this accountholder "to take home and try" (despite the fact that this Accountholder told the Southern sales representative that the accountholder would not purchase the particular delivered brand(s) due to the high price thereof). In response, this accountholder refused to accept the wine and returned it. This accountholder explains that the Southern sales representative's manager was present to observe this event.

83.    During the class period, yet another witness to Southern's fraudulent, anti-competitive conduct worked for Southern as a sale representative. This sales representative often witnessed large liquor stores (e.g., Lucas Liquor) receiving as much as 50% price discount directly

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

from Southern on large case orders. This sales representative witnessed Southern's giving gifts of value up to $200 to liquor stores for large case purchases. These gifts included $200 gift cards and barbecue grills.

84.     During the class period, yet another witness to Southern's fraudulent, anti-competitive conduct worked for Southern in its accounts receivable department and, later, in its customer service department. For several years in this latter position, this customer service ("CSR") employee's District Sales Managers directed this CSR to input fraudulent sales numbers into Southern's ordering system (i.e., to reflect sales that Southern knew were not made). During that time, tremendous pressure was put on this CSR by Southern's management to input false sales numbers. This was a common practice, mostly toward the end of each month, according to this CSR. On at least one occasion when the CSR first refused to input these false sales numbers, the CSR's Regional Sales Director stepped in, confronted the CSR and told the CSR to "do what [the CSR was] f***ing told." As a result, also during those years, this CSR frequently received calls from Southern's accountholders complaining that they received liquor they did not order. This CSR received such complaints from, among others, Walmart, Kroger's, Dollar General, Walgreens, CVS, and Trader Joes as well as well as from many smaller, family-owned businesses. These accountholders complained that, since their discovery of the [fraudulently-ordered] alcohol—and these accountholders' resultant return requests for it—were generally long after the legal grace period for the return of alcoholic beverages had run, they were now stuck paying for it.

85.     Representative Plaintiffs are informed and believe and, on that basis, allege that the allegations set forth above are merely illustrative of the totality of evidence available in support of the claims brought herein.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

**FIRST CLAIM FOR RELIEF**
**PROMISSORY FRAUD**
**CAL. CIV. CODE, §1710**
*(for the California Class Only)*

86.     Representative Plaintiffs incorporate in this cause of action every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

87.     By entering into the Agreement, Southern Glazer made a promise to Representative Plaintiffs and members of both classes regarding a material fact without any intention of performing it. Namely, Southern Glazer promised that it would store private customer information in accordance with law and reasonable business practices, and would not disclose private customer information except under three limited circumstances: (1) unless required by law; (2) to verify continuing financial stability; and/or (3) in an effort or action to collect an unpaid debt to Southern Glazer.

88.     In making that promise, and at all times before, at, and after the time of making the promise, Southern Glazer secretly harbored the intent not to perform its promise to store private customer information in accordance with law and reasonable business practices and not to disclose private customer information except under three limited circumstances.

89.     In making that promise, and at all times before, at, and after the time of making the promise, Southern Glazer secretly harbored the intent to deceive Representative Plaintiffs and members of both classes to enter into the Agreement.

90.     Representative Plaintiffs and members of both classes were fraudulently induced to enter into the Agreement based upon Southern Glazer's promise to store private customer information in accordance with law and reasonable business practices and not to disclose private customer information except under three limited circumstances.

91.     Representative Plaintiffs and members of both classes reasonably relied on the promise made by Southern Glazer under the Agreement.

92.     Despite its promise, Southern Glazer did not store customer information in accordance with law and reasonable business practices and disclosed private customer information for reasons other than the three limited circumstances set forth in the Agreement.

93.     By disclosing the customer account numbers of Representative Plaintiffs and member of both classes to third-parties to facilitate transactions to the detriment and without the knowledge or consent of class members, as well as engaging in transactions using said accounts for Southern Glazer's own benefits, Representative Plaintiffs and members of both classes have suffered and continue to suffer economic losses and other general and specific damages.

94.     The reliance on these promises by Representative Plaintiffs and members of both classes was a substantial factor in causing the harm described herein.

### SECOND CLAIM FOR RELIEF
**COMMON LAW FRAUD**
*(for the California and Nationwide Classes)*

95.     Representative Plaintiffs incorporates in this cause of action every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

96.     Southern Glazer willfully, falsely, and knowingly misrepresented material facts relating to the manner in which it would use class members' license/account numbers, failing to provide adequate protection and confidentiality regarding this and/or other identifying information, and disclosing/supplying account information to third-parties to facilitate transactions to the detriment and without the knowledge or consent of class members, as well as engaging in transactions using said accounts for Southern Glazer's own benefits. The prohibition against such conduct is expressed and/or implied in the common contract between the parties.

97.     Southern Glazer intended that Representative Plaintiffs and members of both classes rely on said misrepresentations in order to induce them to do business with Southern Glazer.

98.     The conduct of Southern Glazer constitutes fraud against Representative Plaintiffs and members of both classes. Southern Glazer, directly and/or through its agents and employees, made false representations to Representative Plaintiffs and members of both classes that were likely to deceive Representative Plaintiffs and class members. Representative Plaintiffs and the

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

1   members of both classes were misled by these false representations in purchasing goods and/or

2   services from Southern Glazer and/or entering into and/or maintaining agreements therewith.

3       99.     Representative Plaintiffs and members of both classes reasonably relied on said

4   misrepresentation by doing business with Southern Glazer, and suffered harm in that they incurred

5   tax liabilities for purchases made on their liquor accounts/licenses without their knowledge or

6   consent.

7       100.    Representative Plaintiffs' and members of both classes' reliance on said

8   misrepresentations was the sole cause of his/their suffering/harm.

9       101.    As a further direct and proximate result of Southern Glazer's actions,

10  Representative Plaintiffs and members of both classes have suffered and continue to suffer

11  economic losses and other general and specific damages, including, but not limited to the monies

12  paid and/or owed to Southern Glazer and/or to third-party taxing authorities, and any interest that

13  would have accrued on those monies, and by being subjected to unfair business practices and unfair

14  competition which, in turn, lowered class members' profitability, all in an amount to be proven at

15  trial.

16      102.    Moreover, at all times herein mentioned, Southern Glazer intended to cause or acted

17  with reckless disregard of the probability of causing damage to Representative Plaintiffs and

18  members of both classes, and because Southern Glazer was guilty of oppressive, fraudulent and/or

19  malicious conduct, Representative Plaintiffs and members of both classes are entitled to an award

20  of exemplary or punitive damages against Southern Glazer in an amount adequate to deter such

21  conduct in the future.

22

23

24

25

26

27

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

### THIRD CLAIM FOR RELIEF
### BELOW COST SALES
### VIOLATIONS OF CAL. BUS. & PROF. CODE §17043
*(for the California Class Only)*

103.   Representative Plaintiffs incorporate in this cause of action every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

104.   As alleged herein, Southern Glazer intentionally engaged in unlawful below cost sales, including offering to sell, selling, and/or giving away liquor products at a price below cost. Such practices also run afoul of 4 CCR §106.

105.   The liquor products offered, sold, and/or given away were the same as those normally sold in Southern Glazer's regular course of business and were not sample sizes or new products (i.e. products Representative Plaintiffs had not previously purchased).

106.   Southern Glazer's below-cost sales were made in bad faith.

107.   Southern Glazer's sole purpose in engaging in the conduct detailed herein was to achieve maximum profitability and market share through damaging and/or destroying competition, through manipulative and/or high-pressure sales, incentive and distribution tactics, illegal pricing schemes, quasi-monopolistic distribution and sales methods, deceptive business practices, and modifying, concealing and/or destroying evidence of its wrongdoing.

108.   In engaging in these unlawful business practices, Southern Glazer has enjoyed an advantage over its competition and a resultant disadvantage to the public and California class members.

109.   Southern Glazer's conduct was a substantial factor in causing harm to Representative Plaintiffs and members of the California class.

110.   As a direct and proximate result of Southern Glazer's actions, Representative Plaintiffs and members of the California class have suffered and continue to suffer economic losses and other general and specific damages, including, but not limited to the monies paid and/or owed to Southern Glazer and/or to third-party taxing authorities, and any interest that would have accrued on those monies, and by being subjected to unfair business practices and unfair

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

competition which, in turn, lowered California class members' profitability, all in an amount to be proven at trial.

111.   Representative Plaintiffs and members of the California class are entitled to an injunction, preventing Southern Glazer from engaging in this unfair and unlawful behavior, and treble the damages sufficient to correct the harm Representative Plaintiffs and California class members have suffered, as well as reasonable attorneys' fees and costs, pursuant to Cal. Bus. & Prof. Code §§ 17070 and 17082, all in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**LOSS LEADER SALES**
**VIOLATIONS OF CAL. BUS. & PROF. CODE §17044**
*(for the California Class Only)*

112.   Representative Plaintiffs incorporate in this cause of action every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

113.   As alleged herein, Southern Glazer intentionally engaged in unlawful below cost sales, including offering to sell, selling, and/or giving away liquor products at a price below cost.

114.   In doing so, Southern Glazer's purpose was to encourage the purchase of other products and/or to deprive business from or otherwise injure competitors.

115.   Southern Glazer's conduct was a substantial factor in causing harm to Representative Plaintiff and members of the California class.

116.   As a direct and proximate result of Southern Glazer's actions, Representative Plaintiffs and members of the California class have suffered and continue to suffer economic losses and other general and specific damages, including, but not limited to the monies paid and/or owed to Southern Glazer and/or to third-party taxing authorities, and any interest that would have accrued on those monies, and by being subjected to unfair business practices and unfair competition which, in turn, lowered California class members' profitability, all in an amount to be proven at trial.

**117.**   Representative Plaintiffs and members of the California class are entitled to an injunction, preventing Southern Glazer from engaging in this unfair and unlawful behavior, and

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

1    treble the damages sufficient to correct the harm Representative Plaintiffs and California class

2    members have suffered, as well as reasonable attorneys' fees and costs, pursuant to Cal. Bus. &

3    Prof. Code §§ 17070 and 17082, all in an amount to be proven at trial.

4

5                              **FIFTH CLAIM FOR RELIEF**
                                      **SECRET REBATES**
6                 **VIOLATIONS OF CAL. BUS. & PROF. CODE §17045**
                              *(for the California Class Only)*
7

8            118.    Representative Plaintiffs incorporate in this cause of action every allegation of the

9    preceding paragraphs, with the same force and effect as though fully set forth herein.

10           119.    As alleged herein, Southern Glazer secretly gave payments, rebates, refunds,

11   commissions, and/or unearned discounts to some buyers that were not offered or given to other

12   buyers on like terms.

13           120.    Such conduct has a tendency to destroy competition.

14           121.    Southern Glazer's sole purpose in engaging in the conduct detailed herein was to

15   achieve maximum profitability and market share through damaging and/or destroying competition,

16   through manipulative and/or high-pressure sales, incentive and distribution tactics, illegal pricing

17   schemes, quasi-monopolistic distribution and sales methods, deceptive business practices, and

18   modifying, concealing and/or destroying evidence of its wrongdoing.

19           122.    In engaging in these unlawful business practices, Southern Glazer has enjoyed an

20   advantage over its competition and a resultant disadvantage to the public and California class

21   members.

22           123.    Southern Glazer's conduct was a substantial factor in causing harm to

23   Representative Plaintiffs and members of the California class.

24           124.    As a direct and proximate result of Southern Glazer's actions, Representative

25   Plaintiffs and members of the California class have suffered and continue to suffer economic losses

26   and other general and specific damages, including, but not limited to the monies paid and/or owed

27   to Southern Glazer and/or to third-party taxing authorities, and any interest that would have

28   accrued on those monies, and by being subjected to unfair business practices and unfair

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

competition which, in turn, lowered California class members' profitability, all in an amount to be proven at trial.

125.     Representative Plaintiffs and members of the California class are entitled to an injunction, preventing Southern Glazer from engaging in this unfair and unlawful behavior, and treble the damages sufficient to correct the harm Representative Plaintiffs and California class members have suffered, as well as reasonable attorneys' fees and costs, pursuant to Cal. Bus. & Prof. Code §§ 17070 and 17082, all in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**
**UNLAWFUL THREATS & INTIMIDATION**
**VIOLATIONS OF CAL. BUS. & PROF. CODE §17046**
*(for the California Class Only)*

126.     Representative Plaintiffs incorporates in this cause of action every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

127.     As alleged herein, Southern Glazer threatened and/or otherwise intimidated Representative Plaintiffs and members of the California class to effectuate provision of liquor products below cost in violation of Cal. Bus. & Prof Code sections 17043, 17044, and 17045.

128.     Such conduct has a tendency to destroy competition.

129.     Southern Glazer's sole purpose in engaging in the conduct detailed herein was to achieve maximum profitability and market share through damaging and/or destroying competition, through manipulative and/or high-pressure sales, incentive and distribution tactics, illegal pricing schemes, quasi-monopolistic distribution and sales methods, deceptive business practices, and modifying, concealing and/or destroying evidence of its wrongdoing.

130.     In engaging in these unlawful business practices, Southern Glazer has enjoyed an advantage over its competition and a resultant disadvantage to the public and California class members.

131.     Southern Glazer's conduct was a substantial factor in causing harm to Representative Plaintiffs and members of the California class.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

132.    As a direct and proximate result of Southern Glazer's actions, Representative Plaintiffs and members of the California class have suffered and continue to suffer economic losses and other general and specific damages, including, but not limited to the monies paid and/or owed to Southern Glazer and/or to third-party taxing authorities, and any interest that would have accrued on those monies, and by being subjected to unfair business practices and unfair competition which, in turn, lowered California class members' profitability, all in an amount to be proven at trial.

133.    Representative Plaintiffs and members of the California class are entitled to an injunction, preventing Southern Glazer from engaging in this unfair and unlawful behavior, and treble the damages sufficient to correct the harm Representative Plaintiffs and California class members have suffered, as well as reasonable attorneys' fees and costs, pursuant to Cal. Bus. & Prof. Code §§ 17070 and 17082, all in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
### BREACH OF CONTRACT
*(for the California and Nationwide Classes)*

134.    Representative Plaintiffs incorporates in this cause of action every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

135.    During the limitations period, Representative Plaintiffs and members of both classes entered into valid contracts, supported by sufficient consideration, as referenced above, pursuant to which Southern Glazer was obligated not to disclose account information/numbers, and to only sell liquor on class members' accounts to authorized agents thereof.

136.    Representative Plaintiffs and members of both classes performed and/or, prior to the termination thereof, remained ready, willing, and able to perform all material terms of these agreements.

137.    Despite the foregoing, Southern Glazer materially breached its contracts with Representative Plaintiffs and members of both classes by disclosing their account information/numbers to third-parties, with the intent of then selling liquor to the third-parties on said licenses, and/or actually sold liquor to third-parties using the account numbers and liquor

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

licenses of Representative Plaintiffs and members of both classes, and/or purchased alcohol using class members' account numbers and liquor licenses in order to make quotas, all without class members' knowledge and consent.

138.    As a further direct and proximate result of Southern Glazer's actions, Representative Plaintiffs and members of both classes were damaged in that they incurred tax liabilities for purchases made on their liquor accounts/licenses.

139.    As a further direct and proximate result of Southern Glazer's actions, Representative Plaintiffs and members of both classes have suffered and continue to suffer economic losses and other general and specific damages, including, but not limited to the monies paid and/or owed to Southern and/or to third-party taxing authorities, and any interest that would have accrued on those monies, and by being subjected to unfair business practices and unfair competition which, in turn, lowered class members' profitability, all in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF
### UNFAIR BUSINESS PRACTICES UNDER THE UNFAIR COMPETITION ACT
### CAL. BUS. & PROF. CODE, §17200, *ET SEQ.*
*(for the California Class Only)*

140.    Representative Plaintiffs incorporate in this cause of action every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

141.    Representative Plaintiffs and members of the California class further bring this cause of action, seeking equitable and statutory relief to stop the misconduct of Southern Glazer, as complained of herein, and seeking restitution from Southern Glazer for the unfair, unlawful and fraudulent business practices described herein.

142.    The knowing conduct of Southern Glazer, as alleged herein, constitutes an unlawful and/or fraudulent business practice, as set forth in California Business & Professions Code §§17200-17208. Specifically, Southern Glazer conducted business activities while failing to comply with the legal mandates cited herein. Such violations include but are not necessarily limited to damaging and/or destroying competition through manipulative and/or high pressure sales,

1   incentive and distribution tactics, illegal pricing schemes, quasi-monopolistic distribution and

2   sales methods, deceptive business practices, and modifying, concealing and/or destroying

3   evidence of its wrongdoing in violation of, *inter alia*, 4 CCR §§17, 52, 76, 106, the three-tier

4   system codified under 27 U.S.C. §205, the Sherman Antitrust Act (15 U.S.C. §1, *et seq.*), the

5   Robinson-Patman Act (15 U.S.C. §13), Cal. Bus. & Prof. Code §§17043, *et seq.*, 23501, and

6   23985, *et seq.*), Cal. Civ. Code §1572 and 1714.

7        143.   Moreover, in engaging in these unlawful business practices, Southern Glazer has

8   enjoyed an advantage over its competition and a resultant disadvantage to the public and class

9   members.

10        144.   Southern Glazer's knowing failure to adopt policies in accordance with and/or

11   adhere to these laws, all of which are binding upon and burdensome to Southern Glazer's

12   competitors, engenders an unfair competitive advantage for Southern Glazer, thereby constituting

13   an unfair business practice, as set forth in California Business & Professions Code §§17200-17208.

14        145.   Southern Glazer has clearly established a policy of accepting a certain amount of

15   collateral damage, as represented by the damages to Representative Plaintiffs and members of the

16   California class herein alleged, as incidental to its business operations, rather than accept the

17   alternative costs of full compliance with fair, lawful and honest business practices ordinarily borne

18   by responsible competitors of Southern Glazer and as set forth in legislation and the judicial record.

19        146.   Representative Plaintiffs and members of the California class request that this Court

20   enter such orders or judgments as may be necessary to enjoin Southern Glazer from continuing its

21   unfair, unlawful, and/or deceptive practices and to restore to Representative Plaintiffs and

22   members of the California class any money Southern Glazer acquired by unfair competition,

23   including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code

24   §17200, *et seq.*; and for such other relief set forth below.

25

26

27

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

Third Amended Complaint for Damages, Restitution, and Injunctive/Equitable Relief

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

# REQUEST FOR RELIEF

**WHEREFORE**, the Representative Plaintiffs, on behalf of himself and each member of members of the proposed Nationwide Class and the California Subclass, respectfully request that the Court enter judgment in their favor and for the following specific relief against Defendants, and each of them, jointly and separately, as follows:

1.      That the Court declare, adjudge, and decree that this action is a proper class action and certify each of the proposed classes and/or any other appropriate subclasses under F.R.C.P. Rule 23 (b)(1), (b)(2), and/or (b)(3), including appointment of Representative Plaintiffs' counsel as Class Counsel;

2.      That Defendants be found to have breached their contracts with Representative Plaintiffs and members of both classes;

3.      That Defendants be found to have made fraudulent and/or negligent misrepresentations to Representative Plaintiffs and members of both classes;

4.      For an award to Representative Plaintiffs and members of both classes of compensatory damages in an amount to be proven at trial;

5.      That Defendants be found to have violated 18 U.S.C. §§1961-1968 with regard to the Representative Plaintiffs and members of both classes;

6.      That Defendants be found to have violated Cal. Civ. Code §1572, §1714, and California Business & Professions Code §17000 *et seq.* and 17200 *et seq.*, with regard to the Representative Plaintiffs and members of the California subclass;

7.      That the Court further enjoin Defendants, ordering them to cease and desist from unlawful activities in further violation of California Business and Professions Code §17000 *et seq.* and 17200, *et seq.*;

8.      For an award of restitution and disgorgement of Defendants' excessive and ill-gotten revenues to Representative Plaintiffs and members of the California class;

9.      For a declaration that any and all tax obligations of class members to state and/or federal taxing authorities resulting from Defendants' deceptive, misleading, unfair and unlawful

conduct are properly Defendants' financial obligations. There exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

10.    For an accounting of all monies received by Defendants as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein, and of all transactions conducted between (a) Representative Plaintiffs and members of both classes, on the one hand, and Defendants, on the other hand, and (b) Southern Glazer, on the one hand, and unlicensed third-parties to whom Southern Glazer has (i) sold and/or distributed alcohol and/or (ii) provided alcohol free of charge on the other hand, within the limitations period;

11.    For punitive and exemplary damages in an amount appropriate and sufficient to punish Defendants, and each of them, and deter others from engaging in similar misconduct in the future;

12.    For interest on the amount of any and all economic losses, at the prevailing legal rate;

13.    For an award of reasonable attorneys' fees, pursuant to California Code of Civil Procedure §1021.5 and/or California Civil Code §§1780 (d) and 1794 (d);

14.    For costs of suit and any and all other such relief as the Court deems just and proper;

15.    For all other Orders, findings, and determinations identified and sought in this Complaint.

## JURY DEMAND

Representative Plaintiffs and members of each of the Plaintiff classes hereby demand trial by jury on all issues triable of right by jury.


Dated: May 8, 2018                          **SCOTT COLE & ASSOCIATES, APC**


                              By:    /s/ Scott Edward Cole
                                     Scott Edward Cole, Esq.
                                     Attorneys for Representative Plaintiff
                                     and the Representative Plaintiff Classes

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE TOWER BUILDING
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800